THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARIA UCHYTIL, on behalf of the United States of America,

Plaintiff,

v.

AVANADE INC., a Washington corporation; AVANADE FEDERAL SERVICES, a Delaware corporation; and ACCENTURE FEDERAL SERVICES LLC, a Delaware limited liability corporation,

Defendants.

CASE NO. C12-2091-JCC

ORDER

This matter comes before the Court on Defendants' motion to dismiss (Dkt. No. 93). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and, for the reasons explained herein, GRANTS the motion in part and DENIES it in part.

# I. BACKGROUND

## A. Record Before the Court

As a preliminary matter, the Court determines what content it will rely upon in ruling on this motion. Typically, the Court looks only at the face of a complaint to decide a motion to

dismiss. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). However, under the incorporation by reference doctrine, the Court may also look to "documents whose contents are alleged in a complaint and whose authenticity no party questions." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). Doing so does not convert the motion to dismiss into a motion for summary judgment. *Branch*, 14 F.3d at 454. Instead, the Court "treat[s] such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Here, Defendants ask the Court to consider three documents: a "sole source" letter; a license agreement; and a "justification and approval" letter. (Dkt. No. 93 at 11, 19, 21; *see also* Dkt. Nos. 94-1, 94-2, 94-3.) This presents an atypical "incorporation by reference" scenario. Normally, the doctrine is used "to prevent plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting documents upon which their claims are based." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). That is not the case here. Relator's complaint acknowledges the documents in question—she does not try to obscure them. (*See* Dkt. No. 81 at ¶¶ 50-51, 56.) Nor do Defendants claim she does. Rather, Defendants seek to incorporate these documents into the complaint so they can cite omitted excerpts in support of their position. (*See* Dkt. No. 93 at 11, 19, 21.) But this is a fraud case, and Relator disputes the veracity of those excerpts.[1] The documents thus raise a factual dispute that must be resolved through presentation of evidence. It would not be appropriate to assume their contents are true. Defendants' request is DENIED.

The Court also acknowledges Relator's declaration filed with her response to

---

[1] Briefly, Relator's position is that Defendants' Task Management Tool (TMT) was not a commercial product and that the United States had the unrestricted right to use TMT. The sole source letter states that Defendant Avanade "continually develops fixes and code for new features to TMT," suggesting that the United States did not have rights to all components of TMT. (Dkt. No. 94-1 at 2.) Along the same lines, the license agreement acknowledges that TMT version 2.4 "may also include certain modules or lines of code . . . to which US agencies have license rights." (Dkt. No. 94-2 at 2.) And, the justification and approval letter shows that the United States took the position that TMT is a commercial product. (Dkt. No. 94-3 at 4.)

ORDER
PAGE - 2

Defendants' motion. (*See* Dkt. No. 96.) The declaration offers explanatory information from Relator as to the content of her complaint and the issues posed by Defendants' motion. (*See id.* at 2.) This information is inappropriate to consider on a motion to dismiss and will not be part of the record before the Court.

### B. Facts

From August 14, 2000 to September 1, 2008, Relator Maria Uchytil was employed by Defendant Avanade, Inc. (Dkt. No. 81 at ¶ 13.) From September 1, 2008 to January 31, 2012, Relator was employed by Defendant Avanade Federal Services (AVAFed). (*Id.*) During her employment, Relator oversaw AVAFed's contracts with the United States. (*Id.* at ¶ 15.)

On April 23, 2010, Avanade and AVAFed[2] acquired certain assets from non-parties Ascentium Corporation and Ascentium Federal, Inc. (*Id.* at ¶ 16.) These assets included a computer software product called "Task Management Tool" (TMT). (*Id.* at ¶ 17.) Non-party Invoke Systems developed TMT in 2006 and 2007 to provide simple and effective task management for the United States Air Force Europe (USAFE) and other Department of Defense agencies. (*Id.* at ¶¶ 18-19.) The United States helped fund this development. (*Id.* at ¶ 20.) Ascentium acquired Invoke's assets in 2007. (*Id.* at ¶ 24.) In 2008, 2009, and 2010, Ascentium delivered TMT to several government agencies. (*Id.* at ¶ 26.)

TMT versions 1.x and 2.x were developed in part with mixed (private and government) funding and in part with government funding. (*See id.* at ¶¶ 27-28.) During the relevant time period, TMT was never delivered to a non-governmental customer; was not regularly used for non-governmental purposes; was not sold, leased, or licensed to the public; and was not intended to be sold, leased, or licensed to the public. (*See id.* at ¶¶ 29-34.)

Relator maintains that, under these circumstances, the United States possessed "government purpose rights" (GPRs) in the entirety of TMT. (*See id.* at ¶ 35.) The United States

---

[2] The complaint mentions a third purchaser, Avanade Holdings LLC. (Dkt. No. 81 at ¶ 16.) Because Avanade Holdings is not a party to this lawsuit, the Court does not include it in its statement of facts.

possesses GPRs in computer software that is developed with mixed funding.[3] 48 C.F.R. § 252.227-7014(b)(2). Relevant to this motion, GPRs give the United States the ability to use the software without restriction and to release the software to outside persons for government purposes. 48 C.F.R. § 252.227-7014(a)(12).

According to Relator, Defendants were aware of the United States' GPRs in TMT. (*See* Dkt. No. 81 at ¶¶ 36-38.) Before purchasing TMT in April 2010, Avanade and AVAFed investigated Ascentium's intellectual property rights in TMT and the nature and scope of any rights the United States might have in TMT. (*Id.* at ¶ 36.) This investigation revealed that Ascentium did not have clear title or ownership in the intellectual property rights and that the United States had GPRs in TMT. (*Id.* at ¶ 37.)

Avanade and AVAFed planned to develop a "clean room" product that would take TMT's place and could be sold, licensed, or delivered to the United States free of GPRs. (*Id.* at ¶ 40.) Developing clean room software is a costly and lengthy process where equivalent software is developed by a separate set of engineers with no access to the original product's source or object code. (*Id.* at ¶ 41.) Avanade and AVAFed estimated that it would take up to two years to develop a clean room version of TMT. (*Id.*) They were unable to develop a clean room version by the time Relator's employment with AVAFed ceased. (*Id.* at ¶ 45.)

Relator alleges that, beginning in May 2010—despite its knowledge that the United States possessed GPRs in TMT—AVAFed sold, licensed, and delivered TMT to the United States as if TMT were a "commercial software product" not subject to GPRs. (*Id.* at ¶¶ 46-47.) Relator maintains that AVAFed made several false representations about TMT, including: (1) describing TMT as a "commercial off the shelf (COTS) solution" in a fact sheet distributed to existing and prospective government customers; (2) describing TMT as a COTS product on its website; and (3) describing TMT as "commercial computer software" in a license agreement sent to multiple government customers. (*Id.* at ¶¶ 48-50.) These alleged misrepresentations continued

---

[3] There are exceptions laid out in § 252.227-7014(b)(1). None apply here.

at least through Relator's term of employment at AVAFed. (*Id.*) According to Relator, these representations misled government contracting officers to believe that the United States lacked GPRs in TMT. (*Id.* at ¶ 51.)

Also beginning in May 2010 and continuing through Relator's term of employment, AVAFed sent several "sole source" letters to government contracting officers. (*Id.* at ¶ 52.) The letters stated that "Avanade is the sole developer of TMT, and the application is and remains proprietary to us. We are not obligated to deliver our source code to any other company." (*Id.* at ¶ 56.) These letters omitted the fact that the United States had GPRs in TMT. (*Id.* at 12.) In other words, the letters implied that TMT contracts were not subject to full and open competition. (*Id.* at ¶ 54.) AVAFed also represented through its website and fact sheets that all TMT contracts must be sole source. (*Id.*) The United States used the sole source letters to justify its decision not to offer TMT contracts for competitive bidding. (*See id.* at ¶ 53, 58, 59, 61, 62, 64, 66.)

The complaint lists numerous contracts that were allegedly procured through these misrepresentations. (*Id.* at ¶ 57.) It also references two "justification and approval" letters that explain the United States' reasoning for using a sole source procurement method, including: (1) Avanade is the sole developer of TMT, which is proprietary to Avanade; (2) Avanade is the only company that can provide and support TMT; and (3) Avanade has no obligation to deliver its source code to any other company. (*See id.* at ¶¶ 59-67.) The justification and approval letters also indicated that qualified alternative contractors were available but not selected because the United States believed it could not release TMT to outside companies. (*See id.* at ¶¶ 65, 67.)

On December 23, 2011, Defendant Accenture Federal Services LLC purchased from Avanade and AVAFed the right to use and sell TMT. (*Id.* at ¶ 43.) Accenture's due diligence review revealed the fact that the United States retained GPRs in TMT. (*Id.*)

Based on these facts, Relator brought suit against Defendants, alleging that each Defendant violated the False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq*. (*Id.* at ¶¶ 68-90.)

//

## II. DISCUSSION

### A. Legal Standards

A defendant may move for dismissal when a plaintiff "fails to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To grant a motion to dismiss, the Court must be able to conclude that the moving party is entitled to judgment as a matter of law, even after accepting all factual allegations in the complaint as true and construing them in the light most favorable to the non-moving party. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). However, to survive a motion to dismiss, a plaintiff must cite facts supporting a "plausible" cause of action. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). A claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (internal quotations omitted). Although the Court must accept as true a complaint's well-pleaded facts, "conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper motion to dismiss." *Vasquez v. L.A. County,* 487 F.3d 1246, 1249 (9th Cir. 2007).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This means that a plaintiff must identify the "who, what, when, where, and how of the misconduct charged," as well as "what is false or misleading about a statement, and why it is false." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (internal quotations omitted). This requirement applies equally to FCA claims. *See United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).

### B. Analysis

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment." 31 U.S.C. § 3729(a)(1)(A). The essential elements of an FCA claim are (1) a false statement or fraudulent course of conduct, (2) made

with requisite scienter, (3) that was material, and (4) caused the government to pay out money or forfeit moneys due. *U.S. v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011). "Liability for FCA violations attaches not only as the result of the actual submission of a false claim, but also under the doctrines of false certification and promissory fraud." *Neighorn v. Quest Health Care*, 870 F. Supp. 2d 1069, 1091 (D. Or. 2012) (citing *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006)).

Relator presents a "promissory fraud" theory. According to Relator, Defendants procured TMT contracts with the United States by falsely representing that TMT was a commercial product that the United States had to pay to use. (*See* Dkt. No. 81 at ¶¶ 48-50.) Relator maintains that the entirety of TMT was developed at least in part with government funds,[4] meaning the United States had GPRs in the entire product and thus unrestricted use of the entire product. (*See id.* at ¶¶ 27-28.) Relator further alleges that Defendants knew this representation was false because they were aware the United States had GPRs in TMT. (*See* Dkt. No. 81 at ¶¶ 36-38.) Relator claims this misrepresentation was material because otherwise the United States would not have paid to use TMT and would have used full and open competition procedures for its TMT contract. (*See* Dkt. No. 81 at ¶¶ 58-67.)

### 1. Claims Against Accenture

Defendants argue that Relator fails to state a claim against Accenture. (Dkt. No. 93 at 27.) There is scarce mention of Accenture in the facts section of the complaint. Under the third cause of action, "Violation of the False Claims Act by Accenture," Relator states generally that Accenture acquired TMT in 2011, was aware of the United States' GPRs, and continued to sell

---

[4] Defendants argue that Relator does not make this allegation in her complaint. (Dkt. No. 99 at 6.) While her complaint does not explicitly state that the United States provided funding for the entirety of TMT, this can be inferred from the list of features at paragraphs 27 and 28 of the complaint, the lack of other features mentioned in the complaint, and Relator's overall position. As for which specific versions of TMT fall within the purview of Relator's complaint, (*see* Dkt. No. 99 at 7), that is a factual issue to be resolved at a later date. It is sufficient at this time that the complaint refers to all versions that were in use up until the time of her termination.

TMT to the United States as a commercial software product. (Dkt. No. 81 at ¶ 84-85.) Relator further alleges that Accenture sent out sole source letters that made false representations about TMT and omitted material information about the United States' rights. (*Id.* at ¶¶ 86-87.) However, unlike the allegations against Avanade and AVAFed, these allegations do not include identifying details, such as specific contracts, dates, or recipients of sole source letters. Given the heightened pleading standard for fraud claims, this will not suffice.

The complaint further notes that Accenture "signed novation agreements with the government, assuming the obligations and duties of AVAFed for each government contract that was purchased by Accenture from AVAFed." (Dkt. No. 81 at ¶ 89.) While this may be true, such an agreement would not confer FCA liability on Accenture. *See U.S. ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1332 (4th Cir. 1989) (novation agreement conferred "liability for performance of the contract, but not for any statutory liability under the False Claims Act"). "The intentional and secretive nature of the fraudulent activity is unrelated to the performance of the contract, *i.e.*, it is related solely to the attainment of the contracts." *Id.*

The Court thus concludes that Relator fails to state a claim against Accenture. Defendant's motion is GRANTED in this respect. However, Relator seeks leave to amend any pleadings the Court deems insufficient. (Dkt. No. 95 at 6.) "Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Krainski v. Nev. ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 972 (9th Cir. 2010). The Court thus GRANTS Relator leave to amend her complaint as to her claims against Accenture.

Any further reference to Defendants herein refers only to Avanade and AVAFed.

2. Plausibility

Defendants argue that Relator fails to state a plausible claim for relief. (Dkt. No. 93 at 15-17.) First, Defendants allege that the existence of GPRs do not strip Avanade of its proprietary rights in TMT. (*Id.* at 15-16.) While this is true, it is also irrelevant. The question here is not

whether Avanade owns TMT, but whether Avanade may charge the United States for its use of TMT. Defendants' own authority demonstrates this. *See Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1044 (9th Cir. 1983). In *Northrop*, the court stated that the government's rights in certain data did not divest Northrop of its own right to continue to use that technology. *Id.* But Avanade's right to use TMT is not at issue in this case.

Defendants also argue that GPRs do not automatically entitle the United States to delivery of the TMT source code.[5] (Dkt. No. 93 at 16.) "For that to happen," Defendants allege, "the Government must both request and require delivery of specific software code under the contract." (Dkt. No. 93 at 16.) As presented, this argument is a red herring. Relator accuses Defendants of improperly charging the United States for its use of TMT; it is unclear how the issue of delivery impacts this claim. And the authority cited does little to illuminate the matter. *See* 48 C.F.R. § 215.470(b) ("When data are required to be delivered under a contract, include DD Form 1423, Contract Data Requirements List, in the solicitation."); Department of Defense 5010.12-M, *Procedures for the Acquisition and Management of Technical Data* §§ DL1 (definition section), C3 (regarding acquisition of data).

In addition, Defendants argue that partial government funding does not automatically entitle the United States to use of the entire product, specifically to use of later-developed components that used only private funds. (*See* Dkt. No. 93 at 17-18.) Again, while this is technically true, it is irrelevant at this stage. The complaint alleges that the United States helped fund the entirety of TMT. To the extent Defendants dispute this allegation, that is a factual question not properly resolved on a motion to dismiss.

Defendants further claim that the dispute as to whether TMT is a "commercial" product is

---

[5] To the extent Defendants argue that the United States was not entitled to use the TMT source code, (*see* Dkt. No. 93 at 16-17), the regulations contradict this allegation. *See* 48 C.F.R. § 252.227-7014(b)(2) (United States has GPRs in computer software developed with mixed funding); 48 C.F.R. § 252.227-7014(a)(12) (GPRs give United States unrestricted use of computer software); 48 C.F.R. § 252.227-7014(a)(4) (computer software includes source code).

simply a difference in interpretation of government regulations and thus not actionable under the FCA. (Dkt. No. 93 at 22) (citing *U.S. v. Honeywell Int'l, Inc.*, 2014 WL 12579803 at *4 (C.D. Cal. Jan. 24, 2014) ("The mere allegation that Defendant improperly interpreted government regulations regarding commerciality and segregability does not give rise to the plausible inference that it did so knowingly or recklessly in violation of the False Claims Act.")). The relevant regulation defines "commercial computer software" as software that is (1) developed or regularly used for non-governmental purposes and (2) has been sold, leased, or licensed to the public; has been offered for public sale, lease, or license; or will be available for public sale, lease, or license prior to delivery of the product. 48 C.F.R. § 252.227-7014(a)(1). Relator's complaint categorically states that TMT was not developed or regularly used for non-governmental purposes, and had never been available for public sale, lease, or license. (Dkt. No. 81 at ¶¶ 30-33.) This leaves little room for an alternative interpretation.

Defendants offer no explanation for their position and the authority they cite fails to prove their point. *See* 42 U.S.C. § 103(1) (providing the same definition of "commercial" as the provision above); 10 U.S.C. § 2302(3)(I) (same); 48 C.F.R. § 46.101 (defining "off-the-shelf item" as "an item produced and placed in stock by a contractor, or stocked by a distributor, before receiving orders or contracts for its sale"); 48 C.F.R. § 2.101 (defining COTS products as items that are commercial as defined in 48 C.F.R. § 46.101, substantially sold in the commercial marketplace, or offered to the United States in the same form in which they are commercially sold). If the facts are as Relator alleges them, the Court cannot find Defendants' interpretation reasonable.

Defendants' motion is DENIED as to plausibility.

3. Materiality

Finally, Defendants argue that Relator fails to sufficiently plead materiality. (Dkt. No. 93 at 24.) The FCA defines material as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The

materiality inquiry looks to "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs. v. United States ex rel. Escobar*, __ U.S. __, 136 S. Ct. 1989, 2002 (2016).

Defendants first state that Relator makes only a conclusory assertion as to materiality. (Dkt. No. 93 at 25; *see also* Dkt. No. 81 at 75.) This ignores the complaint's 10 full paragraphs that explain how the misrepresentations induced the United States to pay for TMT and to not solicit outside contracts. (*See* Dkt. No. 81 at ¶¶ 58-67.) Relator's response brief summarizes these paragraphs well:

> But for these false statements or omissions, the Government would have known that it had rights to the TMT source code. And if the Government knew it had rights to the TMT source code, it would not have paid for a license to use TMT and it would have been obligated by law to use full and open competition procedures to solicit and award contracts for support and maintenance of TMT.

(Dkt. No. 95 at 22.) Given Relator's claims—that Defendants misrepresented the rights the United States had in TMT and required payment for rights the United States already had—the Court finds it plausible that such fraudulent statements would influence the United States' decision to contract with—and pay—Defendants.

Defendants also argue that Relator does not allege any other contractors could have provided services for a lower price. (Dkt. No. 99 at 6.) However, the complaint does reference other available contractors who were not pursued based on Defendants' representations. (Dkt. No. 81 at ¶¶ 65, 67.) And, by law, government contracting officers are required to "promote and provide for full and open competition in soliciting offers and awarding Government contracts." 48 C.F.R. § 6.101; *see also* 10 U.S.C. § 2304; 41 U.S.C. § 3301. In other words, but for Defendants' misrepresentations about the United States' rights in TMT, the United States would have understood that it could provide TMT to outside contractors and thus could solicit contracts with other companies. The "sole source" illusion having been destroyed, the United States would have been compelled to solicit bids through full and open competition, rather than contract with only Defendants. Defendants' motion is DENIED as to materiality.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 93) is GRANTED as to claims against Accenture and otherwise DENIED. The Court further GRANTS Relator leave to amend her complaint as to her claims against Accenture. If Relator chooses to do so, she must file an amended complaint within 30 days of this order's issuance. The Court's dismissal of those claims will take effect only if Relator does not amend them within 30 days.

DATED this 29th day of June, 2017.

John C. Coughenour
UNITED STATES DISTRICT JUDGE