THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARIA UCHYTIL, an individual on behalf of the United States of America,<br><br>Plaintiff,<br><br>v.<br><br>AVANADE, a Washington Corporation, *et al.*,<br><br>Defendants. | CASE NO. C12-2091-JCC<br><br>ORDER |

This matter comes before the Court on Defendants' motion to exclude the testimony of Robert Zeidman (Dkt. No. 152) and motion to exclude the testimony of Dr. Christina Tapia (Dkt. No. 154). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part both motions for the reasons explained herein.

I. **BACKGROUND**

The Court has described the facts of this case in detail in prior orders (Dkt. Nos. 104, 205) and will briefly summarize relevant information here. Relator brings this False Claims Act ("FCA") action against her former employers. She alleges Defendants obtained Department of Defense contracts for the software product "Task Management Tool" ("TMT") and supporting services through false statements and material omissions regarding the nature of the software and

the Government's rights to its source code. (*See generally* Dkt. No. 105.) Relator presents Dr. Christina Tapia as her damages expert and Mr. Robert Zeidman as an expert in software code comparison. (Dkt. Nos. 155 at 7–26, 153 at 6–60.) Defendants filed separate motions to exclude the testimony of both experts.

## II. DISCUSSION

### A. Relator's Motion to Strike

As a preliminary matter, the Court addresses Relator's motion to strike the final six pages of Defendants' motion to exclude Dr. Tapia's testimony. (Dkt. No. 165 at 4.) Relator argues that the Court should treat Defendants' motions to exclude as motions *in limine*, to which the procedures and page limits in Local Civil Rule 7(e)(5) apply. (*Id.*) In this District, motions to exclude expert testimony under Federal Rule of Evidence 702 are not consistently treated as motions *in limine* and subjected to this rule. The Court therefore DENIES Relator's motion.

### B. Legal Standard

An expert witness may testify at trial if such expert's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The expert witness must be "qualified as an expert by knowledge, skill, experience, training, or education," and may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* This "knowledge" must be based on "more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993).

Expert testimony is liberally admitted under the Federal Rules of Evidence. *Daubert,* 509 U.S. at 588 (internal quotations omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 596).

//

**C.     Testimony of Dr. Christina Tapia**

Relator offers Dr. Tapia as an economic damages expert. (*See* Dkt. No. 155 at 7.) Defendants move to exclude her testimony, arguing it rests on impermissible opinions about the Government contracting process and Defendants' state of mind, and that her damages model is not a product of reliable principles and methods. (Dkt. No. 154 at 7, 11.) Defendants also move to exclude Dr. Tapia's opinions regarding funding sources for TMT. (*Id*. at 15.) Based on these objections, Defendants ask the Court to exclude Dr. Tapia's testimony in its entirety. (*Id*. at 16.)

1. Opinions Regarding the Government Contracting Process

Defendants argue that Dr. Tapia's opinions regarding government contracting rest on an impermissible interpretation and application of federal contracting law, and should be excluded.[1] Relator responds that the statements are "clearly not [opinions]" but "recitation of the relevant [legal standards]." (Dkt. No. 165 at 7.) But what is clear is that Dr. Tapia goes beyond reciting federal regulations to apply legal standards to the facts. Relator goes on to admit as much, stating "Dr. Tapia demonstrates understanding and application of the correct legal standard for GPR." (*Id*. at 8.) Relator further asserts that Dr. Tapia merely cites and accepts as true allegations in the operative complaint. (*Id*.) Dr. Tapia's expert report does not read as such. Instead she states she "understands" certain premises alleged in the complaint and draws legal conclusions therefrom. (*See, e.g.*, Dkt. No. 155 at 13, 25.)

The Court finds that Dr. Tapia's opinions regarding the government contracting process are impermissible legal conclusions on ultimate issues of law. *See Tubar v. Clift*, No. C05-1154-JCC, slip op. at 3 (W.D. Wa. May 12, 2009). "Expert testimony concerning an ultimate issue is not *per se* improper." *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1106 (9th Cir. 2004. However, Dr. Tapia offers opinions on a complex topic outside her area of expertise.

---

[1] For example Defendants object to Dr. Tapia's statement that she "understands that TMT was subject to Government Purpose Rights (GPR)" and her opinion that, according to regulations governing GPR, "Defendants [therefore] . . . did not have the right to restrict the Government's uses of TMT." (Dkt. No. 155 at 13.)

She has no specialized knowledge of federal contracting law or practice. (Dkt. Nos. 155 at 69, 165 at 4.) Her opinions on the Government contracting process involve disputed issues regarding the parties' "legal rights, duties, and obligations under the law" better left to a judge. *Nationwide Transp. Fin. v. Cass Information Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).

Therefore, the Court will exclude the following portions of Dr. Tapia's testimony interpreting and applying federal regulations: testimony regarding Government Purpose Rights in TMT source code, testimony on whether TMT qualifies as "commercial" or "COTS," testimony regarding regulatory definitions of Government funding, and testimony regarding Government contract and bidding procedures.[2] If Dr. Tapia seeks to use this information at trial to present her damages model, she must be clear that she is making assumptions for purposes of her model, not offering opinion on legal issues outside of her expertise and purview.

The Court GRANTS Defendants' motion as to Dr. Tapia's testimony interpreting and applying federal regulations.

### 2. Opinions Regarding the Parties' State of Mind During the TMT Procurement Process

Defendants next assert that Dr. Tapia offers improper opinions about the parties' state of mind or intentions.[3] (Dkt. No. 154 at 10.) Relator counters that these opinions "are the product of reasoned analysis" based on evidence Dr. Tapia examined and her expertise, and are thus proper expert testimony. (Dkt. No. 165 at 9.) The Court disagrees.

Relator argues that Dr. Tapia's experience as an economist "trained to determine how markets work" provides an expert perspective on the motivations behind Defendants' contracting

---

[2] Defendants give only page numbers to identify testimony they seek to exclude. (Dkt. No. 154 n. 11.) The Court has difficulty parsing out exact portions of Dr. Tapia's opinion to which Defendants refer. Instead, the Court will generally exclude opinions as listed herein.

[3] Defendants object to Dr. Tapia's opinions that Defendants' false statements and omissions caused the Government to procure TMT services on a sole-source basis, that Defendants knew they must "find a way to detach the government rights" to TMT, and that Defendants' false statements or omissions "led the Government to conclude that it had no GPR in TMT" and to "use a sole-source procurement method." (Dkt. Nos. 154 at 10, 165 at 9.)

decisions. (Dkt. No. 165 at 9.) She characterizes Dr. Tapia's statements as an expert determination that "barriers to entry, such as the Government's decision to award TMT service contracts on a sole-source basis in reliance on statements made by Defendants, impact price." (*Id*. at 10.) As an economic expert, Dr. Tapia is free to provide expert testimony to assist jurors in understanding barriers to entry, sole-source procurements, and impact on price. But outside of economic factors, her expertise does not extend to "[evaluation of] the [parties'] communications, actions, or intentions." *Olympic Pipe Line Co. v. Equilon Pipeline Co.*, No. C01-1310-RSL, slip op. at 1 (W.D. Wash. Jan. 25, 2005). "[T]he jury is perfectly capable of making such determinations." *Id*. Therefore, Dr. Tapia's opinions as to the parties' state of mind are not helpful and are not admissible.[4] *See Daubert,* 509 U.S. at 591–92.

The Court GRANTS Defendants' motion to exclude Dr. Tapia's opinions regarding Defendants' state of mind.

### 3. Methodology for Calculating Damages

Defendants next object to Dr. Tapia's damages model, arguing it is not the product of reliable principles or methods. (Dkt. No. 154 at 11) (citing Fed. R. Evid. 702). Defendants first assert that Dr. Tapia's reliance on profit margin data is unreliable because it fails to capture Government overpayment on firm-fixed-price contracts. (*Id*.) They also argue that Dr. Tapia's model incorrectly measures damages by comparing distinct profit margin metrics.

#### *a. Reliance on Profit Margin Data*

Damages in an FCA action are generally measured by the amount the Government paid due to a false statement over what it would have paid if the statement had been truthful. *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966). Dr. Tapia concludes that the Government "paid a higher price for [sole-source service] contracts than [it would have paid] under full and

---

[4] This includes opinions regarding what the Government knew and why it purchased TMT in the way it did, and Defendants' knowledge and representations, to the extent these opinions do not involve economic analysis.

open competition." (Dkt. No. 155 at 10.) To reach this conclusion, her damages model compares Defendants' profit margins with industry benchmark profit margins. (*Id.* at 10–25.)

Defendants argue this methodology is unreliable and inadmissible because it fails to measure any actual difference in cost to the Government. (Dkt. No. 152 at 12.) Defendants reason that because TMT contracts were firm-fixed price contracts, profit margins depend on the contractor's cost of performance, not necessarily on the price charged to the Government. (*Id.*) They urge that a more useful comparison would be of their labor rates with market labor rates—a comparison that Government contractors undertook. (*Id.*) Relator responds that labor rates are actually a less precise measure of cost on firm-fixed price contracts because the Government's total cost will not shift with the number of hours worked and cost per hour. (Dkt. No. 165 at 12.) Relator further explains that Dr. Tapia's methodology relies on the general economic principle that profit margin is impacted by competitive pressure. (*Id.* at 14.) Dr. Tapia uses an average profit margin of firms in the industry to estimate "the expected profit margin Defendants would have obtained" in a competitive environment. (*Id.*)

The Court finds Dr. Tapia's methodology sufficiently reliable and based on economic principles to survive Defendants' *Daubert* motion. Defendants may argue this method's deficiencies at trial through cross examination and presentation of contrary evidence. *Primiano*, 598 F.3d at 564.

### b. *"Apples to Oranges" Comparison*

Defendants further object to Dr. Tapia's model by arguing that the profit margins she compares are "different metrics." (Dkt. No. 154 at 14.) This, Defendants maintain, is an impermissible "apples to oranges" comparison. *Id.* (citing *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.* 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005)).

Defendants assert that Dr. Tapia compares their "contract controllable income" ("CCI"), which measures revenue less delivery costs on a specific contract, with industry benchmark operating margins, which account for *all* operating costs. (*Id.*) As such, "operating profit is

*always* lower than CCI." (*Id*. at 15.) Relator counters that "Load Cost Rates" incorporated into Defendants' CCI metrics account for this difference. (Dkt. No. 165 at 14.) After reviewing available financial documents, Dr. Tapia concluded that "Load Cost Rates" capture general operating costs not related to a specific contract. (*Id*.) On this basis, she found it appropriate to compare Defendants' CCI with industry operating margins. (*Id*.) Relator admits that Defendants have not clearly outlined the costs included in CCI, and thus, Dr. Tapia's assumption may be incorrect. (*Id*.) However, the Court finds that Dr. Tapia has drawn reasonable inferences and comparisons, which Defendants may challenge through cross examination and presentation of evidence at trial. *See Primiano*, 598 F.3d at 564.

The Court concludes that Dr. Tapia's model is the product of reliable principles and methods and DENIES Defendants' motions to exclude this portion of her testimony

                4.   <u>Opinions Regarding Funding Sources for TMT</u>

An expert's methodology is reliable only if the legal grounds used in forming her opinion are "legally acceptable." *DSU Medical Corp. v. JMS Co., Ltd*., 296 F. Supp. 2d 1140, 1148 (N.D. Cal. 2003). The Court agrees with Defendants that Dr. Tapia's opinion regarding funding sources for TMT is not supported by law.

Dr. Tapia opines that because Defendants "only have government contracts and government-funded projects . . . any funds" used for software development "must necessarily have been government-funded" unless Defendants can show funds came from another source. (Dkt. No. 155 at 30.) The Defense Federal Acquisition Regulation System ("DFARS") clearly defines "developed at private expense" to mean "development . . . accomplished entirely with costs charged to indirect cost pools, costs not allocated to a government contract, or any combination thereof." 48 C.F.R. § 252.227-7014(a)(8). Software is "developed with mixed funding" when costs are in part charged to indirect cost pools or not allocated to a government contract, and in part "charged directly to a government contract." *Id*. at § 252.227-7014(a)(10). These regulations focus on whether costs are charged to a government contract, not a company's

ORDER
C12-2091-JCC
PAGE - 7

general source of revenue. Dr. Tapia's position that profits earned on any government contract and later allocated to internal cost pools constitute "government funding" is not supported by law and will be excluded. *See Nationwide*, 523 F.3d at 1060 (a district court may exclude evidence relating to erroneous legal theories).

The Court GRANTS Defendants' motion to exclude Dr. Tapia's testimony applying an incorrect standard to determine funding sources for TMT.

**D.     Testimony of Robert Zeidman**

Relator offers Mr. Ziedman as an expert in software source code comparison. (*See* Dkt. No. 153 at 8, 21.) Defendants raise a number of objections to separate portions of his reports, ultimately moving to strike Mr. Zeidman's entire testimony. (Dkt. No. 152 at 5–6.) Mr. Zeidman's opinions relate primarily to development of Accountability Management for the Public Sector ("AMPS"). (Dkt. No. 153 at 21.) However, the Court recently dismissed any claims relating to the single AMPS contract before it. (Dkt. No. 205 at 10–11, 20.) Therefore, Defendants' motion to exclude portions of Mr. Zeidman's testimony related to AMPS is DENIED as moot. The only issue left for the Court is Defendants' objection to Mr. Zeidman's opinion on segregability of portions of TMT versions 2.4 and 2.5. (*See* Dkt. No. 153 at 54–59.)

         1.     Segregability

Defendants argue that Mr. Zeidman's testimony is unreliable because he uses legally incorrect standards when discussing "segregability." (Dkt. No. 152 at 6.) Under the DFARS, the doctrine of segregability impacts the Government's rights in noncommercial computer software. *See* 48 C.F.R. §§ 227.7203-4, 227.7203-5; (*see also* Dkt. No. 205 at 12–14). Determinations of funding sources for software development are made "at the lowest practicable segregable portion of the software (e.g., a software sub-routine that performs a specific function)." 48 C.F.R. § 227.7203-4(b).

Mr. Zeidman opines that new, privately-funded[5] code in TMT versions 2.4 and 2.5 is not "segregable" from prior government-funded TMT code. (Dkt. No. 153 at 55–59.) This, he reasons, is because the new code "[relies] upon" and is thus "intertwined" with the prior code. (*Id*.) Mr. Zeidman states that certain new functions "[call] functions that exist previously" and cannot run independently from government-funded code as "stand-alone" programs—thus, they are not "segregable." (*Id*. at 109, 111–12, 116–17.)

The Court finds no support for this view of "segregability" in the governing regulations. On its face, the applicable regulation does not require a "standalone" or "independent" subroutine. Instead it provides as an example of a segregable component, one that "performs a specific function." 48 C.F.R. § 227.7203-4(b). Relator argues that this example is not exhaustive of all "conditions or circumstances under which software qualifies as segregable." (Dkt. No. 162 at 8.) But unless a software subroutine that performs a specific function *never* relies on or calls existing code, Mr. Zeidman does not just present another "circumstance" under which software is segregable, he reads a limitation into the regulation that does not exist.[6] Furthermore Mr. Zeidman's interpretation is inconsistent with the regulations' mandate that "private expense determinations should be made at the lowest practicable level." 48 C.F.R. § 252.227-7014(8). Relator provides no well-reasoned basis for the Court to depart from the regulation's plain meaning and apparent intent.

Thus, the Court concludes that Mr. Zeidman may present expert testimony to help the jury understand the technology at issue in this case and his opinion on whether allegedly segregable portions of software perform "specific functions." But he does not put himself

---

[5] Relator disputes whether this development was truly privately-funded. (Dkt. No. 178 at 32–33.)

[6] Relator argues that Mr. Zeidman opines that the fact that new code is "'intertwined' with or 'linked' to prior code shows a lack of specific functions." (Dkt. No. 162 at 8.) This argument is not supported by Mr. Zeidman's testimony. More accurately, he states that new code performed new functions, but those new functions could not be segregable because they "called" or relied on pre-existing functions. (Dkt. No. 153 at 55–59.)

forward as an expert on the DFARS or provide a basis for his interpretation of the regulations. (Dkt. No. 153 at 126.) The Court will exclude any opinions based on his inaccurate legal interpretation of those regulations. *See Nationwide*, 523 F.3d at 1060.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendants' motions to exclude Dr. Tapia's testimony (Dkt. No. 154) and Mr. Zeidman's testimony (Dkt. No. 152). This order does not preclude the parties from objecting to any improper evidence at trial.

DATED this 21st day of August 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE